Jorge Sarria, demandante y apelado, *v.* V. Alvarez & Co., demandada y apelante; Jorge Sarria, demandante y apelante, *v.* V. Alvarez & Co., demandada y apelada.

Nos. 3985 y 4233.—*Vistos:* Junio 8, 1927 y abril 23, 1928 y junio 21, 1928, respectivamente. *Resueltos:* Diciembre 13, 1928.

*E. López Tizol,* abogado del apelante-apelado; *Besosa & Besosa,* abogados de la apelada-apelante.

EL JUEZ ASOCIADO SEÑOR TEXIDOR, emitió la opinión del tribunal.

Se trata de dos apelaciones sobre una misma sentencia. El demandante reclamó de la demandada la suma de $2,636.80 como principal e intereses de cierta alegada deuda, intereses a partir de la fecha de la interposición de la demanda y las costas del juicio. La demandada negó la reclamación y a su vez contrademandó reclamando del demandante $621.28, intereses y costas. La corte dictó sentencia condenando a la demandada a pagar al demandante $1,778.72 y los intereses legales a partir de la fecha de la interposición de la demanda, sin especial condenación de costas, explicando que dicha suma era la resultante de dos años de sueldo a razón de cien dólares mensuales o sean $2,400 que la demandada debía al demandante, menos $621.28 que el demandante a su vez debía a la demandada.

El demandante y la demandada apelaron de la parte de la sentencia que les perjudicaba, tramitándose sus apelaciones separadamente y celebrándose las vistas de los recursos en distintas fechas. Eso no obstante, estudiaremos las cuestiones suscitadas en una sola opinión.

En la demanda se alegó, en resumen, que por escritura pública de 5 de abril de 1922, la demandada, una sociedad de la cual era socio gestor Victoriano Alvarez, arrendó los servicios del demandante nombrándole su apoderado para representar a la sociedad en cuantos contratos, actos y negocios pudiera la misma intervenir, asignándole por honorarios como tal apoderado la suma de cien dólares mensuales; que el demandante prestó sus servicios como tal apoderado a la demandada desde su nombramiento hasta el 5 de abril de 1924 en que cesó en su cargo; que la demandada no ha pagado al demandante el sueldo devengado que asciende, en

junto, a $2,400 con más $236.80 de intereses a la fecha de la interposición de la demanda.

Contestó la demandada alegando, en resumen, que la escritura de 5 de abril de 1922 fué otorgada, que arrendó los servicios del demandante como empleado, y que luego lo nombró su apoderado, pero que no es cierto que conviniera con él en pagarle cien pesos mensuales solamente como apoderado; que el salario de cien pesos mensuales asignado al demandante, lo fué por sus servicios como empleado general; que el demandante no prestó servicios como apoderado desde el 5 de abril, 1922, hasta el 5 de abril, 1924, y sí como empleado; que pagó al demandante $2,600 por concepto de sus sueldos a razón de cien dólares mensuales como empleado desde febrero 1, 1922, hasta mayo 31, 1924, y que no es cierto que deba al demandante la suma que le reclama, siendo la verdad que pagó al demandante todo lo que le debía por todos conceptos.

Como defensa especial y reconvención alegó la demandada, en resumen, que más o menos el 31 de enero, 1922, la demandada contrató al demandante como empleado general de su comercio con un sueldo mensual de cien dólares que le sería abonado a fin de cada año y contra el cual el demandante podría ir tomando sumas parciales; que allá por abril, 1922, el socio gestor de la demandada Victoriano Alvarez, tuvo que ausentarse de Puerto Rico para hacer compras en los Estados Unidos y en 5 de abril, 1922, otorgó poder a favor de sus empleados Eduardo Alvarez y Jorge Sarria, para que durante la ausencia del gestor pudieran representar a la sociedad; que el demandante Sarria nunca aceptó el poder; que Alvarez, socio gestor, estuvo ausente menos de un mes; que de acuerdo con el contrato de arrendamiento de servicios celebrado, el demandante tomó en diferentes partidas que se cargó a su cuenta desde febrero 1°., 1922 hasta diciembre 31, 1922, la suma de $1,377.03, abonándose él mismo la suma de $1,100 por once meses de ser-

vicios a razón de cien dólares mensuales, quedando a deber $277.03; que de acuerdo con el mismo contrato de arrendamiento de servicios, tomó diferentes partidas que él mismo se cargó a su cuenta desde enero 1°., 1923, hasta diciembre 31, 1923, formando un total de $1,433.68, abonándose él mismo $1,200 por salarios de doce meses y quedando a deber $233.68; que igual sucedió hasta el 31 de marzo, 1924, en que cesó como empleado de la demandada, ésta encontró que había dejado de cargarse dos partidas de $23.77 y $24.15, formando todo un total de $621.28 que el demandante adeuda a la demandada y que ni él ni ninguna otra persona le han pagado no obstante las gestiones que ha hecho para su cobro.

El demandante contestó la contrademanda alegando, en resumen, que no exponía hechos suficientes en oposición ni como causa de acción y negando los hechos expuestos en la misma. Como defensas especiales, que el 31 de enero, 1922, fué empleado como tenedor de libros y corresponsal por la demandada con un sueldo mensual de cien dólares en dicho año y de ciento veinticinco en los sucesivos, que le sería abonado al final de cada año pudiendo tomar cantidades parciales a cuenta; que en dicho cargo cesó el 31 de marzo, 1924; que al cesar, su cuenta de sueldos como corresponsal y tenedor de libros fué saldada de conformidad "pues si es verdad que quedó un saldo en contra de este demandante, el mismo fué saldado por la demandada como una bonificación", y que el sueldo que tenía como apoderado era separado y se le asignó en la escritura de 5 de abril de 1922.

Fué el pleito a juicio. La prueba del demandante consistió:

1°. En la escritura de mandato de abril 5, 1922. Se otorgó ante el notario Crespo Jr. Compareció Victoriano Alvarez y como socio gestor de V. Alvarez & Co., otorgó poder mercantil a favor de Jorge Sarria y Eduardo Alvarez, "para que mancomunada y solidariamente represente a la sociedad en todos los asuntos a que la misma se dedica."

Contiene facultades detalladas y al final un párrafo que dice:
"Así lo otorga, antes haciendo constar que el Sr. Sarria
devengará por honorarios la suma de cien dólares mensuales,
por sus servicios como tal apoderado";

2°. Otra escritura por virtud de la cual se revocó el
poder a Eduardo Alvarez, y

3°. Declaración del demandante. Dijo, en resumen, que
su ocupación era la de tenedor de libros; que como tal y
corresponsal entró en relaciones con la demandada el 1°. de
febrero, 1922, ganando cien pesos mensuales el primer año
y ciento veinticinco el segundo; que con posterioridad fué
nombrado apoderado de la casa con un salario de cien dó-
lares mensuales; que su trabajo se aumentó con el nombra-
miento de apoderado; que no le han pagado sus sueldos de
apoderado.

Contestando a la demandada: que sus funciones eran
llevar la contabilidad y la correspondencia; que nada tenía
que ver con la mercancía; que no extendía cheques; que no
hacía pagos. Rectifica y dice: "Ahora recuerdo que a los
pocos días de entrar el gestor se dirigió a los bancos auto-
rizando mi firma para los cheques"; que autorizó cheques
antes de habérsele otorgado el poder; que le pagaron su
sueldo de cien pesos durante el primer año, no el de ciento
veinticinco durante el segundo; que no tiene constancia
escrita referente a su sueldo, que eso no se acostumbra en
el comercio; que el primer año él mismo se abonó su sueldo,
el segundo porque se trajeron los libros a San Juan; que
él hacía los balances de números cada treinta días, recor-
dando haberlos hecho hasta noviembre 1923; que hacía los
abonos de sueldos en los libros bajo la inspección del gestor;
que no se abonó la cantidad que dice se le debe "porque
precisamente en 1922 al practicarse el balance final en el
momento de hacer todos los abonos de sueldos de empleados,
como las operaciones se hacían estando el gestor presente,
en el momento de yo tratar de hacer los abonos de mi sueldo

de apoderado él me dijo que el balance no había sido suficientemente grande y que dejara el abono de ese sueldo para el año siguiente. Yo protesté porque eso era en contra de mis intereses y me dijo que eso era legal porque al año siguiente lo tendría; que él quería que el balance de ese año apareciera lo suficientemente bueno, y si sacaba $900 más que tenía que sacar por mi sueldo de apoderado rebaja en $900 el balance, y yo protesté, pero él insistió dándome a entender que me amenazaba con despedirme de la casa si no lo complacía, y ante esa perspectiva de perder la colocación yo accedí a sus deseos;" que es cuñado de Marcelino Portela, comanditario de la casa; que hacía absolutamente todo como apoderado; que antes del poder no hacía lo mismo, salvo que el gestor le mandara a hacer algo; que como apoderado hacía empréstitos, libraba, endosaba, aceptaba letras de cambio, vendía mercancía, cobraba, hacía facturas, recogía mercancías de la aduana, firmaba conocimientos de embarque, extraía dinero de los bancos y lo depositaba; que cesó como apoderado el 5 de abril, 1924, que pidió cinco días de licencia porque se fué de la casa el 31 de marzo; que hacía gestiones para cobrar directamente con el gestor; que nunca le escribió.

Esa fué toda la prueba del demandante. La demandada comenzó llamando a declarar otra vez al demandante quien reconoció como suyas las firmas de varios cheques y documentos que se le presentaron. Se le pidió que reconociera cierto documento en maquinilla con una nota manuscrita. Primero dijo que no podía reconocerlo. Cuando se le llamó la atención a la parte manuscrita, ocurrió lo que sigue:

"A.—Haga el favor de ver si Ud. conoce esa letra.—T.—No la conozco.—Dte.—Nosotros solicitamos de la corte que indique al testigo que puede leer el documento y contestar después.—Juez.—El testigo puede tomar todo el tiempo que necesite para leer el papel y entonces contestar.—T.—Se parece a mi letra, pero como no está firmado.—A.—Ud. no recuerda haber escrito eso?—T.—No tiene fecha ni firma.—A.—Ud. podría afirmar que no lo ha escrito?—T.—No sé.

Si viera mi firma sí.—A.—Pero el contenido de esa carta Ud. no recuerda haberlo escrito?—T.—No recuerdo. Si viera la fecha...— A.—Pero por los detalles de la carta Ud. no puede recordar el incidente —Dte.—Que se limite a preguntar si conoce la letra o no.— Juez.—En cuanto al contenido del documento la corte no admite ninguna pregunta porque el documento no está como prueba todavía.— Ddo.—Yo no he presentado el documento. Si él reconoce esa letra como la suya.—T.—Es que no está firmado. Yo no puedo reconocer sin mi firma.—(Ddo.) Abog.—No le pregunto sobre su firma; le pregunto si reconoce la letra como suya.—Juez.—El testigo está obligado a contestar la pregunta que se le hace. Si no es su letra Ud. debe declarar en ese sentido, si no recuerda lo puede decir, y si no está seguro de si es su letra o no también.—T.—Yo contesté que no puedo precisar si es la mía; se parece a la mía, pero como no tiene firma yo no puedo garantizar sin mi firma. Se parece a mi letra.''

Luego identificó ciertos vales de mercaderías como firmados por él y reconoció su letra en el libro diario de la casa hasta diciembre 31, 1923, página 69 hasta 271. Entonces se ofreció el libro como prueba como el libro diario de A. Alvarez y Co. y ocurrió lo que sigue:

''A.—Busque la página 202 de ese Diario. Aparece algún asiento en esa página referente a abonos de Jorge Sarria?—T.—Sí, señor. —A.—Qué cantidad aparece abonada?—T.—$1,100.00.—A.—Por qué concepto?—T.—No dice el concepto. Dice: 'Abonamos por 11 meses de sueldo.'—A.—De quién es esa letra?—T.—De un servidor. Eso está íntimamente relacionado con mi declaración cuando la oposición del gestor?—Yo traté de abonarme y él se opuso.''

Finalmente el testigo fué interrogado por el juez y por su propio abogado, terminando su declaración así:

''J.—El sueldo que tenía como tenedor de libros cuál era?—T.— $100.00 el primer año y $125.00 el segundo.—J.—Ud. tenía un sueldo de $100.00 mensuales?—T.—Sí, señor.—J.—Y Ud. lo cobró?—T.— Tomando cantidades parciales.—J.—Y el sueldo de apoderado era?— T.—Otros $100.00.—J.—Qué?—T.—En igual forma; se me ofrecieron $1,200.00 al año para tomarlos en cantidades parciales. Si necesitaba 8 o 10 pesos semanales los tomaba y los cargaba, esperando a fin de año, y ahí fué el disgusto con el Sr. Victoriano cuando llegó el momento de abonar el sueldo.—J.—Al ser nombrado Ud. apoderado con-

tinuó en sus otras funciones en la casa?—T.—Sí, señor, tenedor de libros y corresponsal.—J.—Continuó siéndolo a la vez?—T.—Sí, señor.—(Dte.) Abog.—Entonces cuántos sueldos tenía Ud. en la casa? —T.—Dos.—A.—Uno de cuánto?—T.—Uno de $100 el 1922 y $125 en 1923 por corresponsal y tenedor de libros. Después necesitaron un apoderado y me nombraron en unión del hermano Eduardo Álvarez, interesado en la casa. Ése no ganaba sueldo, el que ganaba era yo.''

Después del demandante fué llamado a declarar por la demandada el notario Crespo. El demandante se opuso a que declarara sobre las circunstancias en que el poder se había otorgado. La corte permitió la declaración, el demandante tomó excepción y el testigo dijo: ''Ese poder se otorgó el día antes de embarcar Victoriano Alvarez para Estados Unidos a hacer compras. El vino a mi oficina y me dió instrucciones de que hiciera ese poder.'' Luego declaró que era también el abogado de la casa; que después de otorgado el poder se radicó por la casa una demanda en Dorado y hubo un pleito contra la casa, habiéndose entendido con Eduardo Alvarez. Siguió declarando, sin que el demandante se opusiera, que las instrucciones que le dió Alvarez son las que constan en la escritura, que el Sr. Sarria ganaría cien dólares por su trabajo, que las facultades que tiene el poder son las que ejercía Sarria en la casa. Luego a repreguntas del demandante contestó:

''T.—Según lo que yo veía el Sr. Sarria era el tenedor de libros, cobraba dinero y daba recibos, y llevaba el dinero al Banco. Eso es lo que yo veía hacerle antes del poder y luego también.

    ❋        ❋        ❋        ❋        ❋        ❋        ❋

''A Ud. dice que si le confirieron el poder fué en virtud de que se embarcaba?—T.—Se embarcaba el representante de la casa.

    ❋        ❋        ❋        ❋        ❋        ❋        ❋

''A.—Cómo es que si el Sr. Sarria realizaba todas esas series de facultades que se le dan en el poder antes de otorgarse el poder, por qué se le otorgó el poder entonces?—T.—Porque no tenía personalidad para representar la casa. Si estando embarcado Victoriano Álvarez surgía un pleito, ¿quién iba a representar la casa?''

Llamado a declarar el gestor Victoriano Alvarez, dijo, en resumen: que por recomendación del comanditario Portela empleó a Sarria, que en abril tuvo que embarcarse y habiendo algunas cuentas retrasadas dijo: "Voy a darle un poder a ustedes dos para que si yo me embarco tengan poder para embargar; "entonces yo fuí donde el Lcdo. Crespo y le dije: 'Vamos a hacerle un poder para que embarguen. Eduardo Alvarez tiene $30 de sueldo y el 5 por ciento, y a Jorge Sarria se le van a pagar $100 por todos sus trabajos. Cuando se revocó el otro poder tuve que embarcarme otra vez a comprar, y como el otro muchacho se había ido de la casa tuve que retirarle el poder porque no iba a dejar un individuo con un poder fuera de la casa, y entonces fué cuando él se quedó como apoderado. Estando yo ausente tuvieron que demandar a Amelio Miranda y quien vino a presentar la demanda fué Eduardo, y yo le dije a Eduardo: '¿Por qué Jorge no hace uso del poder?' y él me dijo: . . .''; que al entrar Sarria al servicio de la casa no se le asignó sueldo; que convino luego con él cuando le dió el poder en que ganaría cien dólares mensuales como empleado general de la casa; no ofreció pagarle ciento veinticinco el segundo año; que las obligaciones de Sarria eran: "Hacer todo que se le mandara. Como él era el que llevaba la contabilidad de la casa, hacía los cheques, hacía todos los trabajos; por ejemplo, los conocimientos los firmaban todos los empleados y despachaban facturas. Lo único que no podían era embargar porque no tenían poder.''; antes del poder tenía facultades para firmar cheques; después del poder continuó haciendo lo mismo que anteriormente; lee un asiento del libro Diario que dice: "Gastos Generales a Varios.—A Eduardo Alvarez, le abonamos 12 meses de sueldo a $30.00, $360.00.—Manuel Rodríguez, le abonamos 12 meses de sueldo, a $40.00, $480.00.—Aurelio Rodríguez, le abonamos 12 meses de sueldo, a $35.00.— Jorge Sarria, le abonamos 11 meses de sueldo a $100.00,

$1,100.''; que no es cierto lo que dijo Sarria acerca de que se opusiera al abono del sueldo como apoderado; que lo que ganaba Sarria eran cien pesos por todo; que jamás le amenazó; que el día que se fué arregló la cuenta y dijo que quedaba a deber un pico y que cuando se estableciera en Santurce lo iría mandando poco a poco; que Sarria nada le reclamó personalmente; que el primer requerimiento fué la carta de su abogado sobre el pleito; que los balances los hacía Sarria; que vió a éste escribir por dos años y conoce su letra y reconoce como suya la letra de cierto documento que le entregó Emilio Rodríguez, apoderado de Portela y que es el mismo sobre el cual se preguntó a Sarria. Se introdujo como prueba el documento. Se opuso el demandante, y la corte dijo:

"Juez.—Éste es un documento que la corte entiende que ha sido cortado; se ve que no es un corte natural del papel. La corte lo va a admitir condicionalmente a reserva de estudiar la cuestión en cuanto a la mutilación y resolverá oportunamente si lo va a admitir o no."

Que Sarria no se quejó del sueldo que ganaba. A repreguntas del demandante: que Sarria entró a servir en febrero del 22 y el poder se otorgó en abril siguiente; que los libros se trajeron a San Juan por razón de un fuego; que cuando se practicó el balance Sarria no le habló de su sueldo como apoderado, ''él no habló nunca nada de eso, ni en la mente de él estaba eso. El sabía que él ganaba $100.'' Insiste en lo mismo a preguntas del juez y termina así:

"J.—Cómo se le pagaba el sueldo?—T.—Lo iba tomando parcialmente como él quería. Él llevaba también la caja y él mismo estaba autorizado para coger su sueldo y él mismo lo cogía y lo abonaba. Él podía hacer un cheque y decir: 'éste es mi sueldo.' Yo voy a explicar lo que sucedió. Este señor vino a San Juan y se estableció con el cuñado; el cuñado le dió una comandita de $1,000.00, que él mismo le dió el cheque, se estableció en Santurce y parece que el negocio le fué mal, el cuñado parece que no le dió ayuda. Si no hubiera sucedido eso no me hubiera demandado."

El otro dependiente, Eduardo Alvarez, a quien también se le otorgó poder, declaró, en resumen, como sigue: que sus obligaciones eran trabajar en la casa, entrando a las seis de la mañana y saliendo a las seis de la tarde; que atendía al almacen y viajaba por la isla comprando y vendiendo; que conoce a Sarria que fué empleado a principios del 22; que a Sarria le dieron poder, que sus obligaciones antes y después del poder eran las mismas; que Sarria le indicó que lo poco que ganaba escasamente le daba para sostenerse; que le dijo que ganaba cien pesos; que una sola vez se presentó un caso de tener que ir ante una corte y fué él quien fué porque Sarria no quiso ir, diciéndole "que por lo que él ganaba no quería asumir responsabilidades"; que Sarria nunca se le quejó de que no le hubieran pagado como apode-ıado de la firma; que es hermano de Victoriano Alvarez; que era interesado en la firma; que hoy no lo es.

El siguiente testigo fué Emilio Rodríguez, tenedor de libros de la casa Sucesores de José Martínez, de San Juan, a quien se encomendaron los libros de la demandada al traerlos a esta ciudad. Examina el mayor y dice que el último asiento de su página 189 es el de $1,200 que se refiere al sueldo que Sarria tenía en la firma; el año anterior se le había abonado la misma cantidad; que el asiento corresponde al del Diario que dice: "por 12 meses de sueldo a $100 mensuales"; que Sucesores de José Martínez y Portela eran comanditarios de la demandada; que él es apoderado de Portela; que conoce a Sarria personalmente, y lo ha visto escribir y conoce su letra. Se le presenta el *exhibit* 8 y dijo:

"T.—Este papel me fué entregado juntamente con dos cartas más de mi poderdante Marcelino Portela a raíz de una carta que yo le escribí dándole cuenta de que el Sr. Sarria había demandado a V. Álvarez & Co. y yo realmente no estaba bien enterado de lo que había sobre el asunto que él reclamaba $100.00 más, y entonces Marce-lino me escribió contestando ..."

Se opuso el demandante. Siguió declarando el testigo que el documento estaba exactamente en el mismo estado en que lo recibió por correo acompañado de una carta de Portela. El demandado trató de introducir la carta también como prueba y tuvo lugar un incidente que terminó así:

"Juez.—El objeto de presentar esa carta es de probar o establecer en qué forma el testigo vino a tener en su posesión la carta esa que él ha identificado como del Sr. Sarria. Solamente con ese objeto?—Ddo.—Nada más.—Juez.—La corte solamente podría admitir esa carta a ese fin.—Dte.—Nosotros admitimos que la recibió del Sr. Portela. Que el Exhibit 8 declara el testigo que lo recibió del Sr. Portela y nosotros no negamos que lo haya recibido del Sr. Portela. —Ddo.—Y que lo recibió después de octubre 30 de 1924?—Dte.— Lo acepto."

Repite el testigo que no tiene duda alguna de que la letra del documento es de Sarria. El documento en cuestión que ya había sido admitido por la corte en las condiciones que conocemos, dice:

"Como verás por el balance de número mi cuenta aparece debiendo además $285.96 en febrero 28, 1923, y creo conveniente explicarte la causa.—Pues bien: Un mes de sueldo que dejó de abonarme Victoriano, para que 'Gastos Generales' no apareciera muy cargada en balance; o sea: $100.00 que se dejaron de llevar a mi haber. Y $185.96 restantes, que corresponden a varios anticipos que me hizo Victoriano cuando vino a Arecibo para facilitarme los medios del traslado desde San Juan, y para los gastos preliminares al llegar a Arecibo. Quiere decir que lo único que yo estoy debiendo, es $185.96, que estoy haciendo todo lo posible en economías por saldarlo, lo cual espero poder hacer lo más pronto posible.—Te hago todas estas aclaraciones porque no quiero que te pudieras imaginar que fueran gastos excesivos de mi parte; pues tú sabes que yo sé tener control en todos mis actos."

Sigue el testigo declarando con respecto al saldo deudor que arrojan los libros contra Sarria, a los efectos de probar la contrademanda.

Declaró, por último, por la demandada, el testigo Manuel Rodríguez, empleado de la demandada desde su fundación;

conoce a Sarria; que las obligaciones de Sarria antes y después del poder fueron las mismas; que comentó con él varias veces la cuestión de sueldos y que Sarria se lamentaba de que ganaba casi igual que el testigo; que nunca le dijo que ganara más de cien dólares mensuales. Refiriéndose a cierto incidente ocurrido según él por la mañana en una esquina del salón de la corte, expresó:

"T.—El Sr. Sarria me dijo que yo era un servil de V. Álvarez & Co.; que mi hermano se encontraba actualmente empleado en la casa de Vilá & Co. siendo uno de los socios el Sr. Marcelino Portela que era comanditario de la casa de V. Álvarez & Co., y en tono de amenaza me dijo que escribiría para que dejasen cesante a mi hermano en dicha casa si yo declaraba en contra de él, y yo le dije que yo venía solamente a declarar la verdad del caso y que no estaría de parte del demandante ni del demandado sino que declararía la verdad."

La prueba documental de la demandada consistió en sus libros de comercio, en la escritura de su constitución, en treinta y seis cheques expedidos a favor de diferentes personas y firmados "V. Alvarez & Co. por J. Sarria", de los cuales cuatro corresponden a febrero, 1922, siete a mayo, 1922, y cinco a principios de abril, 1922, antes del día 5, en el *exhibit* 8 anteriormente transcrito, en otra carta a Portela enviándole un cheque y un balance firmado; "V. Alvarez & Co., por Jorge Sarria" que tiene al pie una nota personal firmada: "Jorge", y en el balance de números correspondiente a diciembre 31, 1922.

Como prueba de *rebuttal* declaró otra vez el demandante, en resumen, así: que no es cierto lo que dijo el testigo Manuel Rodríguez que él le había dicho; que él no trajo los libros de la casa a San Juan, que los trajo el gestor: que el balance de 1923 lo hizo a sus espaldas, en San Juan, Emilio Rodríguez; que desempeñó el puesto de apoderado porque le ofrecieron cien pesos por el cargo; que se los ofreció Victoriano Alvarez; que si no, no hubiera asumido nuevas responsabilidades gratuitamente. Con respecto a lo dicho

por Eduardo Alvarez de haberse negado a presentar la demanda contra Aurelio Miranda de Dorado, contestó:

"T.—No, señor, él quería que yo presentara la demanda de embargo y como yo tenía otras cosas que hacer y él era perezoso le exigí que fuera él, y además que yo tenía entendido que un apoderado no estaba facultado por la ley para presentar demandas de embargo."

Su declaración terminó así:

"Dte.—A.—Aquí se ha dicho por los testigos, y especialmente por el Sr. Victoriano Álvarez, que Ud. es en deber determinada cantidad a la firma V. Álvarez & Co. que Ud. demanda. Ud. debe a esa casa alguna cantidad de dinero?—T.—No, señor.—A.—Por algún concepto debe Ud. algo?—T.—Por ningún concepto.—A.—Por qué dice usted que no debe nada?—T.—Realmente no debo nada.—A.—Liquidaron Uds. todas sus cuentas al terminar?—T.—Como es costumbre en el comercio, el gestor me dijo: (si queda un balance en contra tuya se te abonará', pero como ellos tenían los libros yo no puedo precisar.—Ddo.—A.—Ud. tiene alguna constancia por escrito del ofrecimiento que le hizo el Sr. gestor Victoriano Álvarez sobre que le daba un sueldo de $100 mensuales como apoderado?—T.—Como apoderado no.—Juez.—Ud. declaró hace un momento que al retirarse Ud. de la casa el gestor señor Álvarez le hizo unas manifestaciones en cuanto al balance, en cuanto a lo que aparecía. Repítame eso.—T.—Yo le pregunté ¿y ese dinero de mi sueldo del cargo de apoderado? y dijo: Eso se arreglará cuando vayamos a San Juan. Si algún saldo queda en contra o a favor tuyo se arreglará."

Tal fué, en extracto, la prueba practicada durante el juicio. Conocemos la sentencia dictada por la corte.

El juez de distrito, en su opinión y en la sentencia, estimó que la escritura de poder era clara en cuanto a la fijación de sueldo para Sarria como apoderado y sobre esa base decidió el caso, en cuanto a este extremo.

Declaramos que, si bien toda la prueba que en el juicio se admitió tendente a desvirtuar o cambiar los términos de la escritura de poder, era inadmisible, la decisión, de acuerdo con la escritura de poder, es correcta, y no hay en ella los errores que por la parte demandada y apelante se señalan.

Precisa tener en cuenta el artículo 25 de la Ley de Evidencia, importantísimo en este caso.  El texto legal es este:

"Artículo 25.  Cuando las condiciones de un convenio se hayan consignado por las partes en un documento, se considerará que contiene éste todas dichas condiciones, por lo que no cabrá entre las partes y sus representantes o sucesores en interés, evidencia alguna de las condiciones del convenio, fuera de lo contenido en el documento, excepto en los siguientes casos:

"1.  Cuando una equivocación o imperfección en el documento fuere alegado en el litigio.

"2.  Cuando la validez del convenio constituyere el hecho controvertido.

"Pero este artículo no excluye otra evidencia de circunstancias bajo las cuales fuere hecho el convenio, o con las cuales se relacionare, según lo definido en el artículo veinte y ocho o para explicar una ambigüedad extrínseca, o probar ilegalidad o fraude.  La palabra 'convenio' incluye escrituras y testamentos, así como contratos entre las partes."

Nótase en este pleito que no se ha hecho alegación alguna de error o imperfección en el documento, ni se ha suscitado la cuestión de validez o nulidad del convenio, ni hay ambigüedad externa o extrínseca, ni aparece la alegación de ilegalidad o fraude.  Y nótase asimismo que la ley ha comprendido en la palabra "convenio" no sólo el verdadero contrato, sino también los actos jurídicos, como el testamento.

El artículo de que tratamos, encarna el principio de la regla del "parol evidence," regla que más que de puro propósito procesal, es de fundamental principio de respeto a la convención escrita.

En este caso, en la escritura de poder o mandato aparecen las frases que antes se han copiado:

"Así lo otorga, antes haciendo constar que el Sr. Sarria devengará por honorarios la suma de cien dólares mensuales, por sus servicios como tal apoderado."

Los conceptos son perfectamente claros; y por ellos la mercantil otorgante, expresando los servicios que ha de

prestar el apoderado, se obliga a remunerarlos, en una cantidad mensual, cierta y determinada.

Esta declaración hecha por la mercantil otorgante del poder, tiene, de acuerdo con el párrafo segundo del artículo 1186 del Código Civil, una fuerza obligatoria entre ella y Sarria al aceptar éste el mandato; y esa misma fuerza, con la importantísima de hacerla una presunción concluyente, se la da el número 2°. del artículo 101 de la Ley de Evidencia. En este artículo 101 que acabamos de citar, existe una regla de suma importancia para la prueba en el caso y para la decisión. El número 3°. dice así:

"Siempre que una de las partes hubiere, por su propia declaración, acto u omisión, inducido intencional o deliberadamente a otra de las partes, a creer en la verdad de una cosa y obrar en esa creencia, no se podrá en ningún litigio a que diera lugar dicha declaración, acto u omisión, permitir a aquélla que la refute."

Y si la demandada hizo la declaración que antes se copia, y el demandante actuó de acuerdo con ella, no hay para la primera, posibilidad legal de refutar su declaración, que causó u originó un estado de derecho entre ella y Sarria.

Base fundamental del artículo 25, de la Ley de Evidencia, es la presunción de que en el convenio consignado en un documento se han incluido, se han fundido todos los propósitos y todas las negociaciones previas, y que las partes han dado cuerpo en ese documento a todo cuanto quisieron y pretendieron al poner en contacto sus voluntades. Y sobre esa base se estableció la regla de que lo consignado en el convenio escrito es la verdad, y toda la verdad; regla que como se ve en el artículo y en la copiosísima jurisprudencia en la materia, tiene sus naturales y ligeras excepciones. Pero, en general, se prohibe la admisión de prueba para variar, enmendar o contradecir lo que una vez fué escrito por acuerdo de las partes, en los casos de acción fundada en aquel documento, y entre las mismas partes que lo suscribieron, o sus causahabientes. Véase, a este propósito Chamberlayne's

Modern Evidence, tomo 5, pág. 4906, y siguientes concordantes.

Esta regla se halla en vigor en Puerto Rico, según se ha declarado por la Corte Suprema de los Estados Unidos en el caso *Veve* v. *Sánchez,* 236 U. S. Reports, 234, donde se dijo:

"La regla prohibiendo que por evidencia oral se varíen los contratos escritos no se halla confinada a la ley común, y estaba en vigor en Puerto Rico cuando se hizo este contrato."

Y en el caso *Cabrera* v. *American Colonial Bank,* 214 U. S. Reports, 224, la misma corte dijo así:

"Las disposiciones del Código Civil español vigente en Puerto Rico hasta 1902, en el sentido de que las obligaciones de un contrato deben ser cumplidas de acuerdo con sus términos, y de que no se puede presentar prueba para variarlas, son prácticamente iguales a los principios de la ley común, y están sujetas a análogas bien conocidas excepciones."

En este caso tenemos un contrato de mandato, que puede ser aceptado por el mandatario tácitamente, y por actos posteriores a la concesión de representación y facultades que hizo el mandante, de acuerdo con el artículo 1612 del Código Civil, ya que no puede concebirse que los actos de ejecución del mandato sean de otra clase que posteriores a éste. El mandato de que se trata se halla expresamente retribuido; y la retribución no se ha hecho, en la realidad práctica.

La sentencia dictada en el caso, de acuerdo con estos principios, se ajusta a la ley, y a la prueba admisible, y aceptable en este pleito.

En cuanto a la sentencia sobre la reconvención, es evidente que el juez de distrito no dió crédito a la prueba que sobre ella presentó el demandante reconvenido; y no hay nada que nos induzca a creer que en ello hubo grave error, ni error alguno, ni que el juez procediera influido por pasión, prejuicio o parcialidad. No encontramos que en este parti-

cular se hayan cometido los errores imputados por el demandante y apelante.

*Por las razones apuntadas debe confirmarse, en su totalidad, la sentencia apelada.*

El Juez Asociado Sr. del Toro, y Asociado Sr. Hutchison, disintieron.

OPINIÓN DISIDENTE DEL JUEZ PRESIDENTE SR. DEL TORO, CON LA CUAL ESTÁ CONFORME EL JUEZ ASOCIADO SR. HUTCHISON.

A los efectos de no alargar innecesariamente esta opinión, acepto los hechos tales como aparecen expuestos en la opinión de la mayoría que antecede.

El artículo 25 de la Ley de Evidencia, dice así:

"Art. 25. Cuando las condiciones de un convenio se hayan consignado por las partes en un documento, se considerará que contiene éste todas dichas condiciones, por lo que no cabrá entre las partes y sus representantes o sucesores en interés, evidencia alguna de las condiciones del convenio, fuera de lo contenido en el documento, excepto en los siguientes casos:

"1. Cuando una equivocación o imperfección en el documento fuere alegado en el litigio.

"2. Cuando la validez del convenio constituyere el hecho controvertido.

"Pero este artículo no excluye otra evidencia de circunstancias bajo las cuales fuere hecho el convenio, o por las cuales se relacionare, según lo definido en el artículo veinte y ocho, o para explicar una ambigüedad extrínseca, o probar ilegalidad o fraude. La palabra 'convenio' incluye escrituras y testamentos, así como contratos entre las partes."

Y el 28, lee como sigue:

"Artículo 28. Para la debida interpretación de un documento, las circunstancias bajo las cuales fuese otorgado, inclusa la situación del objeto a que se contrayere, así como la de las partes, podrán también demostrarse, a fin de que el juez se coloque en la situación de las personas cuyo lenguaje estuviere llamado a interpretar."

La referencia del texto inglés del artículo 25 no es al artículo 28, sino al 34 que dice:

"Art. 34. La evidencia deberá corresponder a las alegaciones esenciales, y ser pertinentes a la cuestión que se ventila. Queda, sin embargo, a arbitrio del tribunal, permitir la investigación de un hecho accesorio siempre que éste estuviere directamente relacionado con la cuestión en controversia, y fuere necesario para su debida determinación o afectase la credibilidad de un testigo."

Como puede verse, esos preceptos guardan estrecha relación con los artículos 1248 y 1249 del Código Civil, a saber:

"Artículo 1248. Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

"Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas.

"Artículo 1249. Para juzgar de la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato."

Podrían citarse cientos de decisiones de la Corte Suprema de los Estados Unidos, de la de España, de las Supremas de los Estados de la Unión y de las Cortes Federales, y admirables pasajes de comentaristas antiguos y modernos, interpretando el principio.

*Corpus Juris* al exponer la regla general, se expresa así:

"La regla sobre la admisibilidad de prueba oral es aplicable generalmente en los contratos, respecto a los cuales se ha establecido que en ausencia de fraude o error, prueba oral o extrínseca no es admisible para variar, ampliar, modificar o contradecir los términos o disposiciones de un documento escrito, mostrándose la intención de las partes, o que su verdadero convenio sobre la cuestión era distinto al expresado en el documento, pues cuando las partes deliberadamente han hecho constar lo convenido por escrito en términos tales que impongan una obligación legal sin incertidumbre alguna, respecto al objeto o alcance de lo convenido. se presume que todas las negociaciones y convenios anteriores relativos a tal cuestión se han confundido en el contrato escrito, e igualmente se presume que el convenio entre las partes y el alcance del mismo se ha hecho constar por escrito. Sin embargo, la regla va aún más lejos, y se ha establecido que cuando el documento carece de ambigüedad y es susceptible de una interpretación clara y sensible no se debe admi-

tir prueba oral o extrínseca para explicar su significado o para determinar la interpretación que debe darse al documento.'' 22 C. J. pág. 1098.

Sigue tratando la cuestión extensamente, y al llegar a las excepciones de la regla, dice:

''Quizás no hay regla de derecho o de evidencia que sea más flexible o que esté sujeta a mayor número de excepciones que la regla que impide que se ofrezca prueba oral para explicar o variar los documentos escritos. Se ha dicho que con el enorme número de excepciones existentes ha surgido mucha confusión, de suerte que el verdadero límite que debe fijarse a las excepciones · depende no solamente de los hechos peculiares de cada caso, sino hasta cierto punto del sentir de los miembros de la corte. *Sin embargo, podría decirse generalmente que las cortes han tratado de adaptar sus resoluciones en una u otra forma, a fin de hacer justicia en todos los casos.* El resultado es que si bien las decisiones son relativamente uniformes respecto a las limitaciones y excepciones a la regla, cuando surge la cuestión de si un caso que presenta determinada relación de hechos cae dentro de la regla general, o fuera de ella, con motivo de las limitaciones o excepciones conocidas, o si está dentro de la regla debido a una de las numerosas limitaciones y excepciones a esas limitaciones y excepciones, las autoridades en muchos casos están en un verdadero conflicto.'' 22 C. J. pág. 1144. (Itálicas nuestras.)

Expuesto lo que antecede, examinemos los hechos del caso tales como aparecen en la primera parte de la opinión de la mayoría.

No hay duda alguna que el gestor de la mercantil demandada acudió ante un notario y otorgó un documento público confiriendo poder al demandante Sarria para representar a la demandada y que al final del documento, aparece lo que sigue:

''Así lo otorga antes haciendo constar que el Sr. Sarria devengará por honorarios la suma de cien dólares mensuales por sus servicios como tal apoderado.''

Aunque la redacción no es del todo correcta, sin embargo, cualquier persona de inteligencia común deduciría de la

lectura del documento que se nombró apoderado a Sarria fijando como compensación por sus servicios como tal la suma de cien dólares mensuales.

Basándose en esa escritura y en haber prestado los servicios a que la misma se refiere, entabló el demandante este pleito.

¿Qué hizo el demandado? En su contestación aceptó el otorgamiento del poder, pero alegó que no era cierto que hubiera convenido con Sarria en pagarle sueldo alguno como apoderado, explicando que Sarria era su empleado y que como tal ganaba y le fué totalmente satisfecho su sueldo de cien dólares mensuales.

¿Es suficiente la contestación? A nuestro juicio lo es, aunque reconocemos que hubiera sido mejor práctica alegar expresamente que hubo una equivocación al consignarse en el poder que el sueldo de Sarria lo era por sus servicios como apoderado, cuando en verdad se fijaba como una compensación por todos los servicios que venía prestando y prestara en lo sucesivo a la mercantil.

Es cierto que hay jurisprudencia que dice que "para que pueda admitirse evidencia oral para demostrar una equivocación en un documento escrito, la existencia de tal equivocación debe alegarse y la alegación probarse", (22 C. J. 1228), pero también existe la que establece que "el principio a virtud del cual se admite evidencia oral para variar la consideración expresada en un documento escrito no descansa sobre la base del fraude, accidente o equivocación, y por lo tanto no es necesario para preparar la base para la admisión de tal evidencia, que la contestación contenga ninguna alegación sobre el particular" (22 C. J. 1161).

El primer caso que se cita para sostener la última nota es el de *Cabrera* v. *American Colonial Bank,* 214 U. S. 224, procedente de Puerto Rico. Al margen de la opinión se transcriben los artículos 25, 28, 111, No. 2, 102, No. 38, y 107 de nuestra Ley de Evidencia y el artículo 1186 de nuestro

Código Civil, y en él, entre otras cosas, se resolvió lo que sigue:

"Las disposiciones del Código Civil Español vigente en Puerto Rico hasta 1902 al efecto de que las obligaciones de un contrato deben ser cumplidas de conformidad con sus términos, y de que no se puede presentar prueba para variarlas, son prácticamente iguales a los principios del derecho común, e igualmente están sujetas a las bien conocidas excepciones." 214 U. S., 224.

Si se examina el artículo 25 de la ley de Evidencia se verá que expresamente se refiere a las condiciones de un *convenio* consignadas por *las partes* en un documento. Aquí el poder fué otorgado exclusivamente por el gestor. El demandante no estuvo presente. No se trata, pues, de un contrato en que ambas partes comparecen y deliberadamente pactan y su pacto queda grabado en la escritura por ellos ratificada y firmada. Para convertir el acto del gestor en contrato hay que ponerlo en relación con Sarria y siendo ello así, ¿como sería posible establecer la relación, sin la ayuda de la evidencia oral? Tan no lo era que el propio demandante al presentar su prueba compareció como testigo y comenzó declarando sobre sus relaciones como empleado de la casa, sobre su sueldo como tal, sobre sus deberes, sobre su nombramiento de apoderado, sobre el aumento de su trabajo después del poder, aunque reconoce que desde el primer momento que entró en la firma sirvió como apoderado. Durante todo el interrogatorio directo la única referencia que hay a la escritura, es ésta: "¿Ese poder fué por algún documento? Sí, señor." Y del conocimiento que tenía el demandante del documento habla este incidente. Al declarar el demandante por última vez y pedirle su abogado que explicara lo dicho por el testigo Eduardo Alvarez sobre el pleito del Dorado, contestó:

"T.—No, señor, él quería que yo presentara la demanda de embargo y como yo tenía otras cosas que hacer y él era perezoso le exigí que fuera él, y además que yo tenía entendido que un apo-

derado no estaba facultado por la ley para presentar demandas de embargo.''

Sin embargo, si hubiera simplemente leído la escritura de poder, hubiera encontrado que su cláusula quinta decía lo que sigue:

''Quinta.—Apremiar amistosamente al pago de los deudores de la sociedad, convenir modo y formas de pago, formalizar recibos y cartas de pago, o para hacer la correspondiente reclamación en los tribunales de justicia competente.''

Siendo esto así, teniendo necesariamente que recurrirse a la prueba oral para establecer el contrato y tratándose simplemente de explicar la consideración del mismo que no fué otra según la demandada que la de ser Sarria su empleado con un sueldo de cien dólares al mes y la de ponerlo en condiciones de representar debidamente a la casa durante la ausencia del gestor realizando todos los deberes que venía cumpliendo y pudiendo especialmente en caso necesario representar en los tribunales a la firma, y que, según Sarria, fué el sueldo separado de cien dólares, es necesario concluir que tal prueba, no obstante la deficiencia que puede advertirse en la contestación, fué debidamente aportada y admitida y debe tenerse en cuenta para la decisión del litigio. Parece conveniente transcribir las propias palabras del demandante contestando a preguntas de su abogado. Son así:

''Dte.—Abog.—¿Qué razón le indujo a Ud. a desempeñar ese puesto?—T.—Que me ofrecieron $100.00 por el cargo.—A.—¿Quién se lo ofreció a Ud?—T.—El gestor Victoriano Alvarez.—A.—¿Si a Ud. no le hubieran ofrecido ese sueldo Ud. hubiera desempeñado el cargo de apoderado?—T.—No, señor, porque yo ganaba $100.00 mensuales de tenedor de libros y corresponsal y no me iba a echar nuevas responsabilidades gratuitamente.''

Examinada la prueba, surge tan claro de ella que sólo de un sueldo por todos sus servicios disfrutaba el demandante, que no nos detendremos ahora en un análisis minucioso. La lógica y completa declaración del gestor, las terminantes

afirmaciones de los otros empleados de la casa, los libros de ésta llevados por el propio demandante hasta noviembre de 1923, lo dicho por él al retirarse de la casa sobre abono de su saldo deudor por bonificación y sobre todo la nota que escribiera·a su cuñado el comanditario Portela, hablan de modo tan elocuente, que las explicaciones que en contrario trata de ofrecer el demandante no resisten su peso. Esa prueba explica la escritura. La escritura fué una verdad, una verdad el poder, una verdad el sueldo, pero el sueldo no se fijó solamente en consideración a los servicios que prestara el demandante a la casa como apoderado, sino para compensar todos sus servicios.

Aún hay más. En el caso de que no pudiera admitirse la prueba explicativa de lo consignado en la escritura, es necesario reconocer que el demandante vendría obligado a probar para reclamar con éxito el sueldo fijado en la misma que él había usado del poder y a nuestro juicio todo lo que la prueba demuestra es que la única vez que realmente se le requirió para que usara del poder, se negó a ello.

Es lo cierto que el trabajo encomendado al demandante en la casa era propio de un apoderado, pero también lo es que él lo hizo desde el principio, como lo demuestran los vales y los cheques aportados como prueba y las declaraciones de los testigos, sin necesidad del poder. Sin éste, hubiera continuado del mismo modo y, en tal virtud, nunca estaría justificada su reclamación fundada en la escritura.

La sentencia declarando la demanda con lugar debe, a virtud de todo lo expuesto, revocarse.

También debe revocarse a nuestro juicio la reconvención. Fué en lo que dijo verdad, según nuestro criterio, el demandante. El saldo deudor se le abonaría como una bonificación. Esa es la práctica general y eso parecía lo justo. Creemos que es cierto que los libros arrojan como debida la suma reclamada, pero creemos que es cierto también que se prometió condonarla. De no haberse iniciado este pleito, jamás

se habría establecido reclamación alguna contra el demandante.